

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00317-CV

_____

IN THE INTEREST OF J.R., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-555534-14

Before Kerr, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant M.M. (Father) appeals the termination of his parental rights to his son Jake,[2] following a bench trial. In one issue with six subparts, Father argues that the evidence is legally and factually insufficient to support the trial court's findings under family code sections 161.001(b)(1)(D) (endangering environment), (b)(1)(E) (endangering conduct), (b)(1)(K) (irrevocable affidavit of voluntary relinquishment), (b)(1)(N) (constructive abandonment), (b)(1)(O) (failing to complete service plan), and (b)(2) (best interest). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (K), (N), (O), (2). Because the evidence is legally and factually sufficient to support the trial court's (b)(1)(O) and best-interest findings, we affirm.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). All children are referred to using aliases.

## II. Background

### A. Overview

H.T. (Mother)[3] is the mother of George, Jared, and Jake. George and Jared share the same father—Jude.[4] All three boys lived with Mother and Jude because Father was not adjudicated as the father of Jake until this case.

In 2013, Jake tested positive at birth for marijuana and was placed with Maternal Grandmother until Mother and Jude proved that they were willing to make the necessary lifestyle adjustments needed in order to provide a safe living environment for Jake. In 2014, the Department of Family and Protective Services (hereinafter the Department or CPS) removed Jake from Mother and Jude's home due to domestic violence and neglectful supervision. Jake was returned to Mother's home in June 2015 after Mother completed the services on her service plan. Jake was removed from Mother's home again in December 2016 after the Department received a report alleging neglectful supervision of all three boys. The report reflected that the home had unsafe and unsanitary conditions[5] and that Mother and Jude had engaged in

---

[3]Mother executed an affidavit of voluntary relinquishment and did not appeal the termination of her parental rights.

[4]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use alias to refer to minor's parents if necessary to protect the minor's identity).

[5]The intake report alleged the following: old food on the kitchen counter; dirty dishes overflowing in the kitchen sink; dirty sheets on the beds; trash on the floor; a mop bucket with dirty water and a litter box full of cat feces in the kitchen; bugs in the home; holes in the walls; dirty diapers on the floor; a smell of urine in the home; a

domestic violence in the children's presence—Mother and Jude engaged in a physical altercation during which Mother hit Jude with an object and broke a window in his vehicle. Police arrested Mother for aggravated assault with a deadly weapon. Jude tested positive at that time for amphetamines on an oral swab drug test.

Jake was placed in foster care because Mother identified someone other than Father as Jake's biological father. Father was added to the termination case by January 2017 and received a court-ordered service plan requiring him to submit to all requests for random drug testing. Throughout the time the case was pending, Father tested positive for drugs and failed to appear for four requested drug tests. At the conclusion of the termination trial, the trial court found, among other things, that Father had not completed the services on his court-ordered service plan and that it was in Jake's best interest for Father's parental rights to be terminated. The trial court then signed an order terminating Father's parental rights to Jake.

---

four-foot by three-foot hole in the hallway; doors broken off the hinges; and electrical and light outlets were missing or were hanging out of the wall.

## B. Trial Testimony[6]

### 1. April 17, 2018

### a. Initial Caseworker[7]

BraRysheyia Simpson, a conservatorship specialist with the Department, testified that when Jake came into the Department's care at the age of three, he was in the one percentile for language development; he could not say a single word and only made buzzing noises. Jake and his siblings had meltdowns whenever water would run during bath time. Jake and his siblings also hoarded food in their jaws and stuffed their mouths until they vomited. Jake was diagnosed with adjustment disorder with mixed disturbance of emotion and conduct, unspecified trauma and stressor-related disorder, and unspecified communication disorder. While the case was pending, Jake received speech and language skills from the preschool program for children with disabilities, play therapy, and individual counseling.

Simpson testified that Father tested positive for marijuana and had a history of mental health issues and that the Department worked with him on achieving housing

---

[6]The reporter's record reflects that the termination trial was held on three dates: April 17, 2018; June 7, 2018; and September 25, 2018. Because five months elapsed between the time that the trial started and concluded, we set forth the testimony based on the date it was given, but we omit the June 7 trial date because on that date, the trial court heard argument only on Paternal Grandmother's request for leave to intervene in the suit and then denied the request.

[7]The initial caseworker had left the Department by the time of the September trial date.

stability, employment, and sobriety through substance-abuse treatment. The goals on Father's service plan that was filed on February 15, 2018, included the following:

> Parent will maintain housing that is safe and free of hazards and provide protection, food, and shelter for the child and family.

> Parent will learn to give and accept appropriate affection, demonstrating an ability to bond[.]

> Parent will show the ability to parent and protect the child.

> Parent will demonstrate an understanding of and ability to provide for the special needs of the child.

The "Tasks And Services" on Father's service plan required him to attend parenting classes at FOCUS for Fathers, to submit to DNA testing to determine Jake's paternity, to participate in individual counseling with Lena Pope Home, to complete a psychiatric consultation regarding his anxiety and to comply with medication management, to complete a drug screening and to fully participate in drug treatment to address his continued marijuana usage, to comply with all requests for random drug testing, and to attend all scheduled visitations with Jake. Father's service plan states, "4. I understand my progress on this plan will be evaluated as follows: A) Have I completed my tasks in the plan?" According to Simpson, Father completed parenting classes, established housing, and maintained employment, but he did not complete most of the services on his service plan.

Father submitted to drug testing during the pendency of the case and tested positive on the following dates:

6

| Collection Date | Type of Test | Positive Findings |
|---|---|---|
| January 10, 2017 | Hair analysis | Marijuana |
| January 13, 2017 | Urinalysis | Marijuana |
| January 18, 2017 | Hair analysis | Marijuana |
| February 13, 2017 | Urinalysis | Marijuana |
| March 7, 2017 | Urinalysis | Benzodiazepine and marijuana |
| March 31, 2017 | Urinalysis | Benzodiazepine, marijuana, hydrocodone, and hydromorphone |
| April 18, 2017 | Urinalysis | Benzodiazepine, marijuana, and hydrocodone |
| May 9, 2017 | Urinalysis | Marijuana |
| July 24, 2017 | Urinalysis | Marijuana |
| August 28, 2017 | Urinalysis | Marijuana |
| November 6, 2017 | Urinalysis | Marijuana |
| December 15, 2017 | Urinalysis | Marijuana |
| January 11, 2018 | Urinalysis | Marijuana |
| February 23, 2018 | Urinalysis | Marijuana |
| March 14, 2018 | Urinalysis | Marijuana |
| March 23, 2018 | Hair analysis | Marijuana |

Additionally, the trial court was allowed to presume that Father would have tested positive had he not "no-showed" for drug testing on May 30, 2017; June 26, 2017; September 25, 2017; and October 9, 2017. Father indicated to Simpson that he did not think his drug use was a problem or would interfere with his ability to parent Jake. Because Father had never tested negative for drugs during the pendency of the case,[8] Simpson did not have any reason to believe that Father could provide Jake with a

---

[8]The CASA volunteer's report to the court that was filed on March 21, 2018, reflects that Father admitted to the volunteer that he has to smoke marijuana every morning in order to function.

drug-free home environment. Simpson testified that a parent's illegal drug use presents a danger to the physical and emotional health of his child.

Simpson stated that Father's visits with Jake, which also included Jared, had gone "quite well." Simpson noted that Father paid more attention to his own son Jake, that he loved on him a lot, that he brought him food and toys, and that he had bonded well with Jake. During the visits, Father worked with Jake on word pronunciations, which had been recommended by Jake's therapist.[9]

At the time of the April termination trial, Jake was almost five years old and was speaking in two- or three-word sentences, no longer had an issue with bath time, and only occasionally stuffed his mouth with food. Simpson testified that all of Jake's needs were being met in foster care.

Simpson testified that Jake would need a lot of attention and care going forward and that stability is a major factor for him. Simpson testified that Father's parenting had improved during the case, but she opined that he could not parent Jake alone due to testing positive for an illegal substance. Simpson opined that Father was not prepared to handle Jake's needs and that Father could not provide a safe, appropriate home for Jake.

---

[9]The CASA volunteer's report to the court that was filed on March 21, 2018, states that Father "seems to not recognize that [Jake] is developmentally delayed" and that he speaks to Jake "in a high pitched tone using two[-]year[-]old words, followed by repeating the same words in Spanish," to which Jake did not respond. The report further states that although Father had engaged with Jake appropriately during visits, he had recently begun watching videos on his phone and was not engaging in any playtime with Jake.

Simpson testified that it was in Jake's best interest for the trial court to terminate Father's parental rights to Jake and that the Department recommended that the trial court terminate Father's parental rights to Jake. Simpson recommended that Jake not be placed with Paternal Grandparents out of concern that they could not protect Jake in the event that Father came over to their house.[10] The Department further recommended that all three children be placed together in one foster home instead of having only Jake and Jared together. Simpson explained that Jake and Jared's foster parents were adoption motivated and were willing to take all three boys. Simpson opined that the foster parents could handle all three boys in the home.

### b. Child's Clinical Psychologist

Dr. Toni Hill, a licensed clinical psychologist, performed a sibling assessment of Jared and Jake five days before the April trial. Dr. Hill testified that it would not be in Jared and Jake's best interest to be split up.

Dr. Hill also performed a developmental evaluation on Jake to assist in risk assessment and treatment planning. Dr. Hill reviewed Jake's prior psychological evaluation from January 24, 2017, which reflected that he had been "raised in a neglectful, chaotic environment where he witnessed domestic violence" and that "he was exposed to prenatal drug use and may have been born drug-exposed in addition to witnessing parental substance use."

---

[10]The Department received a report that Father had violated the rules and had gone to his parents' house when Jake was there for a transitional visit.

Dr. Hill also interviewed Jake's foster mother who stated that Jared and Jake had been in her home since September 2017 and that she was told that her home was the boys' fourth placement.[11] Jake's foster mother told Dr. Hill that this case is the result of "a domestic dispute in which the police were called[,] and the mother was taken to jail, all with the kids present." Jake's foster mother said that Jake's playtime often includes themes involving the police, guns, and going to jail. Jake's foster mother said that Jake is typically affectionate and quite caring, that he is equally connected to her and her husband, and that he calls her and her husband "Mommy" and "Daddy."

After reviewing Jake's prior psychological evaluation and consulting with Jake's foster mother, Dr. Hill observed Jake. Dr. Hill described Jake as a four-year-old male who appeared his chronological age and who exhibited much difficulty with speech articulation, which rendered much of his speech unintelligible. Dr. Hill summarized the findings from her observations as follows:

> [Jake's] observed overall adaptive skills were determined to be slightly below target for his age . . . . This indicates he is not exhibiting significant overall developmental delays at this time.
>
> However, [Jake] is delayed in receptive and expressive communication, supporting a need for ongoing participation in speech therapy. It is also noted that his daily living skills are well below target for his age, indicating a need for an occupational therapy evaluation. [Jake's] interpersonal skills are a strength for him[,] and he is not

---

[11]The CASA volunteer's report to the trial court dated July 24, 2018, stated that Jake and Jared had lived together in five placements.

exhibiting significant developmental delay in this area, including as it pertains to interpersonal relationships and coping skills. . . .

. . . [Jake's] history is positive for drug exposure, neglect, and witnessing domestic violence, all likely contributing factors to his ongoing difficulties and developmental delays.

In addition to ongoing speech therapy and an occupational therapy evaluation, Dr. Hill noted that Jake was in need of stability and consistency in his living environment, as well as regular monitoring of his developmental, medical, and life functioning.

## 2.  September 25, 2018—Completion of Trial

### a.  Replacement Caseworker

Denise Hamilton, who is a CPS caseworker, explained that she took over this case on August 1, 2018, after Simpson left the Department.  Hamilton testified that the Department continued to offer services to Father during the five months while the trial was recessed.  Hamilton stated that Father had not completed every task on his service plan because he had not been successfully discharged from counseling and needed to continue his drug treatment.  Hamilton explained that Father was receiving drug treatment for testing positive for marijuana throughout the time this case was pending.  Hamilton testified that the critical goals that Father needed to accomplish, which had been made clear to him by the Department and the trial court, were to have negative drug tests and to remain sober.  Hamilton said that Father had not

11

remained sober, as shown by repeatedly testing positive for marijuana. Hamilton testified that Father had thus not completed the critical goals on his service plan.

Hamilton testified that she had not received a discharge notice showing that Father had completed drug treatment at Lena Pope Home. Hamilton's records showed that Father had not been successfully discharged from counseling for drug treatment due to his continued drug use and positive drug tests.

Hamilton testified that Father's continuing drug use constitutes endangering conduct and that Father's decision to allow Jake to remain with Mother and Jude, despite knowing that there was domestic violence in the home, was the equivalent of allowing him to remain in an environment that endangered him. Hamilton opined that Father could not provide a drug-free, safe, and stable environment for Jake.

Hamilton testified that Jake and his two brothers had been in foster care for twenty-one months. Hamilton also testified that the three boys had made a lot of progress and were doing well in foster care. Hamilton explained that the children were calmer, were putting words together, and were getting along with each other. Hamilton said that all three boys have special needs and will require extra care. She explained that all three boys receive occupational therapy, speech therapy, and play therapy.

Hamilton testified that the Department had conducted a home study on Paternal Grandparents and at one point had even allowed them to have extended visits with Jake. Those visits ceased because Paternal Grandparents were not being

protective of Jake; they had not followed the rules and had instead allowed Father to be around Jake.

Hamilton opined that it was in Jake's best interest for Father's parental rights to be terminated and stated that the Department recommended that the trial court terminate Father's parental rights to Jake. The Department requested that the trial court name the Department as permanent managing conservator with the right to place the children for adoption. The Department's plan was for all three children to be adopted by Jake and Jared's foster parents.

### b. Father

Father testified that he had learned three days after Jake was born that Mother had listed another man as the father on Jake's birth certificate. Father went to the Office of the Attorney General and pleaded with them to be named as Jake's father but was unsuccessful. Father attempted to hire an attorney but was unable to raise sufficient funds for a down payment.

Despite listing another man as Jake's father, Mother brought Jake and the other boys to Father's parents' house—where Father was living—once or twice a week for approximately two hours each time. It was unusual for Father to go more than a week without seeing Jake, and the longest that he had gone without seeing Jake was three weeks. Father later clarified that he did not visit with Jake when he was in foster care in 2014. Father testified that before Jake was placed in foster care in 2016,

Mother sometimes left Jake with Father, but he had never cared for Jake by himself because he was always surrounded by family members.

Father said that from around November 2016 until the children were placed in foster care in December 2016, the boys were always dirty, they constantly wore the same clothes, and their shoes were always too big. Father was also aware that Mother and Jude's relationship involved domestic violence, that they had used "hard drugs," and that they had a history with CPS. Father testified that he was concerned about Jake living in Mother and Jude's home, but Father admitted that he had never called CPS to report his concerns. Father explained that he did not call CPS because he did not have personal knowledge that Jake was being mistreated.

Father was honest about his drug use throughout the case. Father said that he had never smoked marijuana around any child and that he had never smoked marijuana within twenty-four hours of visiting Jake. Father agreed that he had tested positive for marijuana during the same month as the termination trial. Father testified that the last time he had used marijuana was "[a]bout a month ago." Father agreed that marijuana inhibits his ability to make decisions and that it would not be appropriate for a child to be in an environment where a parent is a continuing drug user. Father was aware that the trial court had ordered him to go to substance-abuse treatment and to stop using marijuana. Father knew that continuing to test positive for drugs during the case could result in the termination of his parental rights.

14

Father agreed that he had been given a service plan and testified that he believed he had completed all of his services. Father then said that he had one more counseling session left at Merit. Father testified that he had completed FOCUS for Fathers, counseling at Lena Pope Home, and DNA testing and that he had attended every visit. At the time of the September trial, Father had been living in his own apartment for approximately a year and a half and was working two jobs.

Father testified that Jake is delayed in speech. Father said that he noticed Jake's speech delay in 2017 when he started visits with him. Father later testified that he had noticed Jake's speech delay when Mother brought him over for visits prior to 2017 and that he had mentioned Jake's speech delay to Mother. Father testified that he had noticed improvement in Jake's speech while he was in foster care.

Father did not believe that Jake was being well cared for by his foster parents because he came to visits wearing dirty, secondhand clothes and shoes that were too big.[12] Father said that when he had visits with all three boys, they were covered in mosquito or ant bites,[13] they were wearing clothes that were too big for them, "they weren't washed right[,]" they had scratch marks on them, and there were occasions when they had gum in their hair.

_____

[12]The CASA volunteer's report stated that she had visited Jake and Jared at their foster home and that both had plenty of clean clothes.

[13]Father explained that he had noticed the mosquito or ant bites during the initial visitations but had not seen as many after he had made a comment to a CPS worker.

15

Father testified that he has a close relationship with Jake. Father said that Jake's favorite game is "cops" and that he also likes when Father acts like a dinosaur. Father testified that it would be in Jake's best interest for Father's parental rights to be preserved because "[h]e has an entire family that's waiting for him."

Father wanted Jake to be placed with Paternal Grandparents. Father testified that Paternal Grandparents are closely bonded with Jake and that Jake appeared happy when he was with them. Father said that Paternal Grandparents had helped raise their other grandchildren.

### c. Father's Sister

Father's sister testified that she saw Jake when he came to Paternal Grandparents' house. She testified that her family and Jake have a close relationship and that he loves her family.

Father's sister had never known Father to smoke marijuana in Paternal Grandparents' house and had never seen him high when he was around Jake. She testified that she did not allow Father to be around her children because "it's not good" and that it is dangerous for a drug user to be around small children. She spoke with Father six months before trial and told him that there was a risk he would lose Jake if he continued to use drugs.

Father's sister said that Father had told her that Mother and Jude were fighting a lot and that neighbors had helped Mother because Jude "was hitting [her] really bad." Father also told his sister that Mother and Jude's home "was in a really bad

condition" and "was really a mess" and that Jake's clothes were always dirty. According to Father's sister, Father said that on one occasion, Mother and Jude were "really high" and were holding Jake and Jared.

Father's sister requested that the trial court place Jake with Paternal Grandparents.

### d. Children's Ad Litem

The children's ad litem, who was appointed two months before the September termination trial, testified that it was impossible for the children to tell him their desires. The children's ad litem opined that it was in the children's best interest for their parents' parental rights to be terminated and agreed with the Department that the children should be placed for adoption.[14]

### C. Outcome

After hearing the evidence and arguments from counsel, the trial court found by clear and convincing evidence that Father had knowingly placed or had knowingly allowed Jake to remain in conditions or surroundings that had endangered his physical or emotional well-being pursuant to section 161.001(b)(1)(D), that Father had engaged in conduct or had knowingly placed Jake with persons who had engaged in conduct that had endangered his physical or emotional well-being pursuant to section 161.001(b)(1)(E), that Father had failed to comply with provisions of a court order

---

[14]The CASA volunteer was not present at the termination trial, but it was announced that CASA was in agreement with the Department and the children's ad litem.

17

that specifically established the actions necessary for him to obtain the return of Jake pursuant to section 161.001(b)(1)(O), and that termination of Father's parental rights to Jake was in Jake's best interest. The trial court's judgment also terminated Father's parental rights to Jake based on sections 161.001(b)(1)(K) and (N). *See In re L.G.R.*, 498 S.W.3d 195, 206 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("When there is an inconsistency between a written judgment and an oral pronouncement of judgment, the written judgment controls."). Father then perfected this appeal from the judgment terminating his parental rights to Jake.

### III. Burden of Proof and Standard of Review

For a trial court to terminate a parent-child relationship, the Department must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that

18

the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Father violated section 161.001(b)(1)(O) and that the termination of the parent-child relationship would be in Jake's best interest. Tex. Fam. Code Ann. § 161.001(b)(1)(O), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. Section 161.001(b)(1) Ground

In the fifth subpart of his sole issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that he failed to comply

19

with the provisions of a court order that specifically established the actions necessary for him to have Jake returned to his care.

Section 161.001(b)(1)(O) provides,

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> . . . .
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(O). A court may not order termination under subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that he (1) was unable to comply with specific provisions of the court order and (2) made a good faith effort to comply with the order and that the failure to comply with the order is not attributable to any fault of the parent. *Id.* § 161.001(d).

Section 161.001(b)(1)(O), as set forth above, has three requirements: (1) the parent's failure to comply with a court order; (2) the child was in the Department's care for at least nine months; and (3) the child was removed from the parent due to abuse or neglect. *Id.* § 161.001(b)(1)(O). The record conclusively establishes that Jake was in the Department's care from December 2016 until the termination trial on

20

September 25, 2018, which was not less than nine months, and that Jake was removed for abuse or neglect while he was in Mother's care.[15] On appeal, Father challenges only the first requirement, arguing that the language in his service plan did not specifically require him to complete drug treatment.

The family service plan filed with the court on May 16, 2017,[16] includes the following among Father's required tasks and services: "Parents are expected to comply with all requests for random drug testing, which may include oral swabs, hair

[15]Father emphasized at trial that Jake did not come into the Department's care as a result of any abuse or neglect by Father. However, on appeal Father does not argue in his analysis of this issue that Jake was not removed from his care for abuse or neglect, that is, he was not the parent who abused or neglected Jake. Such argument would fail. *See In re D.R.J.*, 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.) (concluding that subsection (O) does not require that the parent who failed to comply with a court order be the same person whose abuse or neglect of the child warranted the child's removal); *In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (op. on reh'g) (same).

[16]Although the family service plan was not admitted into evidence during trial, we may presume that the trial court took judicial notice of the family service plan. *See In re B.L.H.*, No. 14-18-00087-CV, 2018 WL 3385119, at *7 (Tex. App.—Houston [14th Dist.] July 12, 2018, no pet.) (mem. op.) (stating that a "trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that the trial court judicially knows"); *see also In re M.C.*, No. 02-15-00290-CV, 2016 WL 354186, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (collecting cases regarding judicial notice of court's file in the context of section 161.001(b)(1)(O)). Moreover, at trial, Father admitted that he understood that his failure to comply with the service plan was a ground for termination.

strand[,] and UA's.  Failure to comply within 24 hours will be an assumed positive result."[17]  The June 19, 2017 initial permanency hearing order states,

> 9.1.  **IT IS ORDERED** that, except as specifically modified by this order or any subsequent order, the plan of service for the parents, filed with the Court on 5/16/17 or attached to this order and incorporated herein by reference as if the same were copied verbatim in this order, is **APPROVED** and made an **ORDER** of the Court.

Simpson testified that Father "no-showed" for drug testing on May 30, 2017; June 26, 2017; September 25, 2017; and October 9, 2017.  Father did not offer any explanation at trial for his failure to comply with requests for random drug testing on those four dates.[18]  On appeal, Father raises no argument—and we do not conclude—that he proved by a preponderance of the evidence that he was unable to comply with specific provisions of the court order, made a good faith effort to comply with the order, and was not at fault for failing to comply.  *See id.* § 161.001(d).  Because "[a] parent's failure to complete one requirement of [his family service plan] supports termination under subsection (O)," we need not address Father's argument on appeal requesting that we parse the language of the service plan to determine whether Father

---

[17]This same task was included in subsequent family service plans that were filed with the court and that were made orders of the court.

[18]The termination order includes the following finding,

8.5.  In accordance with § 161.00l(d), Texas Family Code, the Court finds that [Father] did not prove by a preponderance of evidence that [Father]:  (1) was unable to comply with specific provisions of a court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

was required to complete, rather than merely participate in, drug treatment. *See In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *see also In re B.H.R.*, 535 S.W.3d 114, 122 (Tex. App.—Texarkana 2017, no pet.) ("Ground O does not quantify any particular number of provisions of the family service plan that a parent must not achieve in order for the parental rights to be terminated or the degree of a parent's conduct that will be deemed to be a failure to achieve a particular requirement of the plan.").

Accordingly, applying the appropriate standard of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that Father failed to comply with a court order that specifically established the actions he needed to take for Jake to be placed in his care. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O); *In re J.J.*, No. 05-18-00666-CV, 2018 WL 6167884, at *3–4 (Tex. App.—Dallas Nov. 26, 2018, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support subsection (O) finding because mother did not comply with Department's requests for drug testing, which were required by mother's service plan); *In re D.D.*, No. 02-17-00368-CV, 2018 WL 1630708, at *8 (Tex. App.—Fort Worth Apr. 5, 2018, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support subsection (O) finding because mother did not comply with drug-testing requirements and had some presumed positive results due to failing to

submit to some requested drug tests). We overrule the fifth subpart of Father's sole issue.[19]

## V. Section 161.001(b)(2) Ground

In the sixth subpart of his sole issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in Jake's best interest.

## A. Best-Interest Factors

In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. In making our determination, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A)    the child's desires;

(B)    the child's emotional and physical needs, now and in the future;

---

[19]Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(b)(1) is necessary to support a judgment of termination, we need not address the first four subparts of Father's sole issue challenging the trial court's findings under section 161.001(b)(1)(D), (E), (K), and (N). *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the child's best interest;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and

(I) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Best-Interest Analysis

Jake did not testify at trial, so there is no evidence in the record about his desires regarding placement. The record contains evidence that Jake was bonded to Father. The record also contains evidence that Jake was bonded to his foster parents

25

and that he called them "Mommy and Daddy." The trial court was entitled to find that this factor weighed neither for nor against terminating Father's parental rights to Jake.

With regard to Jake's emotional and physical needs now and in the future, the record reflects that his basic needs include food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to his age. Jake had an unspecified communication disorder and required speech therapy. Although the record contained some evidence that Father went over word pronunciations with Jake during their visits, there was also some evidence that Father did not understand the extent of Jake's speech delay. Jake was diagnosed with adjustment disorder with mixed disturbance of emotion and conduct and unspecified trauma and stressor-related disorder and required stability and consistency in his living arrangements. Yet Father's ability to provide a safe, drug-free, stable home for Jake remained in question at the time of trial due to Father's testing positive for drugs throughout the case. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to the emotional and physical danger to Jake now and in the future, Father acknowledged during his testimony at trial that marijuana inhibits his ability to make decisions and that it would not be appropriate for a child to be in an environment where a parent is a continuing drug user. As noted by Hamilton,

Father's continuous illegal drug use posed a danger to Jake. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to Father's parental abilities, he completed his parenting classes and demonstrated that he was able to interact well with Jake during most visits. The record, however, also reflects that Father had never cared for Jake alone and was not allowed to parent Jake alone due to Father's drug use. Moreover, Father's continuous use of illegal drugs demonstrated that he prioritized drugs over Jake despite knowing that he needed to abstain from illegal drugs in order for Jake to be placed with him. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to the programs available to assist Father to promote Jake's best interest, the record demonstrates that Father worked most of his services but did not fully address the underlying issue that prevented him from having Jake placed with him. Father was not successfully discharged from counseling or drug treatment, failed to appear for all requested drug tests, and tested positive on the drug tests he did take. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to Father's plans for Jake, his service plan states that his hopes and dreams for Jake are that he "would like to care for [Jake] in his home with his family free from violence." Father testified at trial that he wanted Jake to be placed with

27

Paternal Grandparents. The Department did not consider Paternal Grandparents a viable placement option for Jake because they had not abided by the rules in place for extended visits when they had allowed Father to have access to Jake and because they were not willing to adopt all three boys. The Department thus planned for Jake and his two brothers to be adopted by Jake's current foster family. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to the stability of Father's home, he had secured suitable housing but was not seeking to have Jake placed in his home but rather with Paternal Grandparents, who were not a viable placement option. Jake and Jared had been in the same foster home for approximately one year at the time the termination trial concluded, and the Department planned for Jake and Jared's foster parents to adopt all three boys. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Jake.

With regard to any excuse for Father's acts, Father did not testify at trial and does not argue on appeal that there was any excuse for his failure to abstain from using illegal drugs. The trial court was entitled to find that this factor weighed neither for nor against terminating Father's parental rights to Jake.

After reviewing all the evidence, applying the appropriate standards of review, and deferring to the factfinder's credibility determinations, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the

parent-child relationship between Father and Jake was in Jake's best interest. We therefore hold the evidence legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination); *In re R.L.M.*, No. 04-18-00136-CV, 2018 WL 2943651, at *3 (Tex. App.—San Antonio June 13, 2018, pet. denied) (mem. op.) (holding evidence legally and factually sufficient to support the trial court's best-interest finding because mother had not stopped taking illegal drugs during the pendency of the case, had not addressed her substance-abuse problems or changed her behavior with respect to illegal drug use, and was incapable of meeting needs of child who had developmental delays and of providing him with a safe and stable environment). We overrule the sixth subpart of Father's sole issue.

## VI. Conclusion

Having overruled the fifth and sixth subparts of Father's sole issue, which are dispositive of this appeal, we affirm the trial court's judgment terminating Father's parental rights to Jake.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: January 17, 2019

29